554 So.2d 346 (1989)
Catherine Yvonne STONE
v.
GULF AMERICAN FIRE AND CASUALTY CO., et al.
87-269.
Supreme Court of Alabama.
July 5, 1989.
Petition for Leave to Appear for Purpose of Seeking to Vacate or Modify Denied November 9, 1989.
Application for Rehearing Denied November 9, 1989.
*348 David Cromwell Johnson and Thomas W. Bowron II, Birmingham, for appellant Catherine Yvonne Stone.
James E. Williams of Melton & Espy, Montgomery, for appellees Gulf American Fire & Cas. Co. and American States Ins. Co.
James F. Hampton of McLain & Hampton, Montgomery, for appellee Irene Smith.
Robert C. Black of Hill, Hill, Carter, Franco, Cole & Black, Montgomery, for appellee Jones, Murray and Stewart, P.C.
MADDOX, Justice.
This appeal involves the estate of the late Hiriam "Hank" Williams and concerns the rights of Catherine Yvonne Stone, an illegitimate child who, in 1985, was declared by the trial court in this proceeding to be the natural child of Hank Williams, and the major questions presented are whether two final judgments entered in 1967 and 1968, which determined that Stone had no rights to share in the estate, can be reopened because of an alleged "legal fraud."
Stone appeals from a summary judgment against her third-party complaint, in which she asked that the two former judgments be set aside, which judgments had been entered in favor of third-party defendants Irene Smith; Jones, Murray and Stewart, P.C.; Gulf American Fire and Casualty Company; American States Insurance Company (as successor in interest of Gulf American); and several fictitiously named parties.[1]
This case began as an action for declaratory judgment filed by Randall Hank Williams (hereinafter "Williams, Jr."), along with Roy Acuff and Wesley Rose, the trustees in liquidation of Fred Rose Music, Inc., and of Milene Music, Inc., seeking a declaration that Stone was barred from establishing that she is the natural child of Hank Williams and from asserting any claim or entitlement to his estate or to any interest or royalties flowing therefrom.[2] Stone filed a counterclaim on these issues, and, in addition, the third-party complaint that now constitutes the basis of this appeal.
In her third-party complaint, Stone alleged an intentional, willful, fraudulent, and conspiratorial concealment from the court of her identity and potential claim to the estate of Hank Williams.[3] She requested that the estate be reopened and that she receive her proportionate share of the estate,[4] that she be awarded punitive damages, *349 and that the sureties for the estate, Gulf American and American States, compensate her for damages not recovered against the other third-party defendants or real parties in interest.
In the proceedings below, the trial court entered summary judgment in favor of Williams, Jr., Acuff, and Rose on all issues contained in their original complaint and in Stone's counterclaim, with the exception of the issue of Stone's paternity, which it reserved for trial, and the trial court entered summary judgment in favor of all third-party defendants, including those fictitiously named, on Stone's third-party complaint, in which she asked, among other things, that the estate be reopened because of legal fraud. After a trial on the issue of paternity, the court found that Catherine Yvonne Stone is the natural child of Hank Williams. No appeal was taken from this judgment of paternity, and this finding is undisputed on appeal.[5]

Statement of the Facts
An understanding of the unique facts underlying this action is requisite to an understanding of this case, and it is because of these unique facts that we fashion the relief we do in this case. The trial judge entered a lengthy order in which he detailed the facts. We could include those findings, which we find to be supported by the record, in this opinion, but we think that a summary of those facts will be sufficient.
On October 15, 1952, Hank Williams entered into an agreement with Bobbie W. Jett relative to the custody and support of an unborn child carried by Jett. The agreement was prepared by and executed in the presence of Robert B. Stewart, an attorney in the general practice of law in Montgomery, Alabama, who was one of the third-party defendants. The agreement provided, in part, as follows:
"This agreement made this 15th day of October, 1952, by and between Hank Williams of Montgomery, Alabama, and Bobbie W. Jett of Nashville, Tennessee,

"WITNESSETH
"WHEREAS, the said Bobbie W. Jett is at the present time pregnant and expects to be delivered of a child on or about the 1st day of January, 1953, and the said Hank Williams may be the father of said child, and,
"WHEREAS, it is the mutual desire of both parties to provide for the necessary expenses of the said Bobbie W. Jett and of the child to be born,
"IT IS NOW, THEREFORE, mutually agreed by and between the said Bobbie W. Jett and the said Hank Williams as follows:
"... That the said Hank Williams will provide room and board for the said Bobbie W. Jett in Montgomery, Alabama, from October 15th until the date said child is born....
"... That said Hank Williams shall pay all doctors and hospital bills in connection with the confinement of the mother and birth of the child....
"... Within 30 days after the birth of said child, the said Hank Williams shall provide a one-way plane ticket to the said Bobbie W. Jett from Montgomery to another place in California which she may designate....
"... After the birth of said child, both parties agree that it shall be placed with Mrs. W.W. Stone of Montgomery [Hank Williams's mother], and that she shall have full custody and control of said child for a period of two years after its birth and that during said time the said Hank Williams will provide and pay for a nurse and will pay all necessary expenses for clothing, food, medical care, and other attention which is required by the child *350 during said two year period. During said two year period that the child is in custody of Mrs. Stone, both the father, Hank Williams, and the said Bobbie W. Jett shall have the right to visit said child at convenient and reasonable hours. Beginning at the third birthday of said child, its custody and control shall vest in the said Hank Williams and the child shall live with him continuously and be wholly and completely supported ... by him, and cared for by him until it reaches its fifth birthday at which time the custody of the child shall be divided between both parties, that is, during the winter months or school months the child shall remain with Hank Williams and during the summer months or school vacation months the custody shall be in the mother. The responsibility for the support of said child shall be in Hank Williams both during the times when he has custody of the child and when it is visiting with the mother. During the time that the child is in the custody of the father, Hank Williams, the mother shall have the right to visit it at reasonable times, and at reasonable hours, and during the time it is in the custody of the mother during the summer months the father shall have the same privilege of visitation.
"... In view of the fact that the paternity of said child is in doubt and is not to be in any way construed as admitted by the agreement which is made solely because of the possibility of paternity, the said Bobbie W. Jett does hereby release the said Hank Williams from any and all further claims arising out of her condition or the birth of said child.
"IN WITNESS WHEREOF, the parties have hereunto set their hands and on the day and date first above written.
 "/s/
 "Bobbie W. Jett
 "/s/
 "Hank Williams"
(Emphasis added).
On January 1, 1953, Hank Williams died intestate. Five days later, Bobbie Jett gave birth to a baby girl; she named the child Antha Bell Jett. By agreement, the child was left with Hank Williams's mother, Mrs. Lillian Williams Stone, and Jett left the state. Mrs. Stone immediately instituted adoption proceedings, and a final decree of adoption was entered on December 23, 1954. The child's name was changed to Catherine Yvonne Stone.
Shortly thereafter, on February 26, 1955, Lillian Stone died. Other family members were either unable or unwilling to care for the child, and, thus, at the age of two, she became a ward of the State. The child remained in foster homes until she was eventually adopted on April 23, 1959, at the age of six, by a Mobile couple, George and Mary Deupree. Her name was then changed to Cathy Louise Deupree.
In that year, an action was brought on behalf of Williams, Jr., to obtain court approval of a contract between Fred Rose Music, Inc., and Williams, Jr., concerning his interest in the copyright renewals of his father. The matter of the Stone child was not raised in that proceeding, even though the record now before us shows that the parties to that contract knew of the agreement executed by Hank Williams and also that the State of Alabama, by and through its Department of Pensions and Security, knew of her parentage. Then, in 1967, Audrey Williams,[6] the mother of Williams, Jr., filed a petition in Montgomery Circuit Court for final settlement of the estate. She also instituted related proceedings in 1968, concerning the guardianship estate of Williams, Jr. At the time of the 1967 and 1968 proceedings, Irene Smith, the sister of Hank Williams, was the administratrix of the estate. It was in Smith's answer to Audrey Williams's petition that the court was advised, apparently for the first time, of the existence of the agreement and of the potential claim of the Stone child. In both the 1967 and the 1968 proceedings, the *351 court appointed Drayton Hamilton, a Montgomery attorney, to serve as the child's guardian ad litem. Hamilton had previously served as her guardian ad litem in 1963 in proceedings relating to the estate of Lillian Stone; however, the record shows that in 1963, Hamilton knew only that Stone was an adopted child of Lillian Stone and was not aware of her natural parentage.
During 1967 and 1968, Stone lived in Mobile with her adoptive parents. Hamilton notified the Deuprees of the proceedings, but they refused to participate in any matters involving the child's natural father. Despite the Deuprees' adverse position, Hamilton continued to represent the child and actively attempted to establish her rights. Even so, on December 1, 1967, Judge Richard P. Emmet, of the Montgomery County Circuit Court, issued an order stating that Stone had no right to inherit from the estate of Hank Williams. In a second order issued on January 30, 1968, in the related guardianship estate case of Williams, Jr., Judge Emmet again reiterated that Stone had no right to inherit from the estate. In neither proceeding did the court address the issue of Stone's paternity. After the court's adverse ruling, the guardian ad litem sought permission to appeal on behalf of the Stone child; however, the court denied him permission, and he did nothing further on the child's behalf.[7]
Despite the court's rulings in the 1967 and 1968 proceedings, once Stewart became the administrator of the estate in 1969, he began setting aside money for Stone in the event that she ever claimed an interest in the estate. However, the estate was closed in August 1975, without further incident.
The record shows that it was not until 1974, when Stone was 21 years of age and attending the University of Alabama, that the truth of her paternity was ever suggested to her. During that year, she was informed that the Montgomery Circuit Court was holding certain funds for her from the estate of Lillian Stone. She was not informed that Stewart had been setting aside money for her. All the court records pertaining to the 1967 and 1968 proceedings were sealed. Stone traveled to Montgomery and received the proceeds of the Lillian Stone estate, and it appears that it was at that time that she began to seriously seek information concerning her natural parentage.
On October 17, 1979, Stone arranged a meeting with Emogene Austin of the Alabama Department of Pensions and Security for the purpose of verifying her paternity. The record shows that at that time she apparently did not know the name of her natural mother but suspected that Hank Williams was her natural father. Ms. Austin revealed the agency's information to her concerning her background, including information indicating that her natural father was Hank Williams; that information shows that the State of Alabama knew of her background from almost the beginning. However, throughout this time, all of the records concerning her paternity remained sealed by the Montgomery Circuit Court, and she had no knowledge of the existence of the custody and support agreement or of the fact that Stewart had been setting aside her share of the estate, even after the 1967 and 1968 decrees were entered.
Stone continued to search for and retrieve documents and other information bearing on this subject through the early part of 1985. On July 1, 1985, she filed an action in Montgomery Circuit Court requesting that documents relating to her paternity, formerly placed under seal by the Montgomery Circuit Court, be released to her. On August 5, 1985, Stone sent a demand letter to Williams, Jr., Acuff, and Rose, advising them of her claim in the estate and asking to share in the copyright renewals of her father, Hank Williams. Subsequently, on September 10, 1985, Williams, Jr., Acuff, and Rose filed the action for declaratory judgment that eventually led to this appeal.

*352 Issues

The primary issues presented by this appeal are:
I.) whether the former judgments rendered in the 1967 and 1968 proceedings involving Stone's right to share in the estate of Hank Williams can be reopened by reason of legal fraud on the court; and, if so,
II.) whether Stone's claim to set aside the former judgments is barred by the equitable doctrine of laches; and, if not, then
III.) to what relief, if any, is Stone entitled?
In determining the primary issues, we also address the following questions:
a) whether the administrator or the attorney for the estate, having independent knowledge of Stone's claims to the estate, had a duty to notify the court of these facts;
b) whether the trial court's failure, in the 1967 and 1968 proceedings, to grant the guardian ad litem permission to appeal the adverse ruling on behalf of Stone constitutes an error of law sufficient to warrant modification of the judgment;
c) whether an illegitimate child is entitled to inherit from her natural father;
d) whether the doctrines of res judicata and collateral estoppel are applicable to the issues involved in this case; and finally,
e) whether Stone's adoption, two years after the death of her natural father, precludes her from establishing her paternity for the purpose of intestate succession.

Fraud
We now address the first issue, concerning legal fraud. Stone argues that the trial court erred in entering a summary judgment for the third-party defendants in this case because, she says, the evidence shows that they fraudulently conspired to keep certain facts relating to her existence, identity, and potential claim to the estate of Hank Williams concealed from the court. We agree.
The record contains substantial evidence from which a factfinder could conclude that third-party defendants Robert Stewart and administratrix Irene Smith and others withheld from the court before and during the 1967 and 1968 proceedings material facts concerning the issue of Stone's paternity. The evidence that follows indicates the series of events that transpired both prior to and following the death of Hank Williams that directly affected the fate of the child for whom Williams had unequivocally accepted responsibility by executing an agreement which contains some equivocation, but in which he referred to himself three times as the "father." These events ultimately resulted in the foreclosure of any contract right that the child might otherwise have had under the 1952 custody and support agreement, as well as the adverse judgments concerning her right to inherit, which are now the subject of this appeal.
The record shows that on October 15, 1952, Hank Williams accompanied Bobbie Jett to the law offices of his attorney, Robert Stewart, to discuss a legal arrangement concerning an unborn child being carried by Jett. Mrs. Lillian Stone, Hank Williams's mother, was also present. At this meeting, Stewart prepared the custody and support agreement involved in the present lawsuit. According to Stewart's testimony in the 1967 proceedings, he represented only Hank Williams at the time the agreement was executed and at no time was Bobbie Jett or the unborn child represented by counsel.
After Hank Williams's death in January 1953, it was Stewart who prepared the letters of administration that were issued to Williams's mother, Lillian Stone, as administratrix. Although Stewart knew of the child's existence, identity, and potential claim to the estate, because he had drafted the custody and support agreement only three months earlier, the letters of administration contained only the names of the following persons as heirs and distributees of the estate:
"Billie Jean Jones `who states she is the widow,'

*353 "Randall Hank Williams, Jr.,
"Mrs. Irene Williams Smith, a sister,
"Elonzo H. Williams, father, and
"Lillian S. Stone, mother."
It is interesting to note that the list did include Billie Jean Jones, "who states she is the widow" of the deceased; yet, it did not include Stone.
Over the course of 22 years following the death of Hank Williams, Stewart remained actively involved in the affairs of the Williams family. Throughout the years 1953 to 1975, Stewart served as the attorney for the estate, and from 1969 through 1975 he also served as the administrator of the estate.
In 1953, Stewart even acted as Lillian Stone's attorney in her action to adopt the child. The record shows that at all times, Mrs. Stone held the child out to Stewart and to the world as the daughter of her deceased son, Hank Williams. This is evidenced by the following notes taken during an investigation conducted by the Montgomery County Department of Public Welfare, prior to Mrs. Stone's adoption of the child:
"1/28/53
"Mrs. Stone discussed her situation with ease throughout the entire interview, but cried during the time that she was talking. She said that she was in the office in regard to a child which was born on January 6, 1953. She explained that the child is the daughter of Bobbie Webb Jett and that the father of the child is her son, Hank Williams, deceased. She brought with her a letter stating to whom it may concern and signed by Mr. Williams. It said that he would be responsible for the delivery of this child at the hospital where the mother desired.... She mentioned that she took care of Miss Jett throughout the pregnancy ... [and] that her son took care of all the expenses during this time.
"... She stated that Miss Jett had left the child at her home during the time that she was making a visit to Butler County, her home, and that she does not know what Miss Jett plans to do. She stated that she does not wish to keep the child unless she can adopt her and that she would be tremendously interested in doing so. While crying, she stated that she knew that this is what her son would want her to do, and he once commented that he did not feel that Miss Jett was a suitable person to take care of the child. Mrs. Stone seemed quite devoted to the child and it was apparent that she was very desirous to keep this child as it appeared that she would feel closer to her son. She went on to say that Miss Jett lives in Nashville and that all their papers are with [Mrs. Stone's] lawyer, Mr. Robert B. Stewart....
"* * * *
"During this interview, Mrs. Stone commented that she had a heart ailment and worker gathered that it must be somewhat serious. She said that Mr. Stewar[t] was not in accord with their adopting the child because of this heart condition and I went into a discussion with her asking her whether or not she was able to take care of the child and what plan would be made for its future in the event that this baby was left parentless. She stated that her daughter, Mrs. Irene Smith of Portsmouth, Va. would be glad to take the child and I wondered if she would be interested in taking her at this time. Mrs. Stone would not want her to take the child as she would like to have the baby herself." (Emphasis added.)
The adoption became final on December 23, 1954, following which Stewart continued to remain closely associated with the Williams family, and, in particular, with Irene Smith, Hank Williams's sister. The following letter, dated April 6, 1953, when the child was three months old, evidences the relationship of Smith and Stewart with regard to the estate of Hank Williams and the Stone child:
"Dear Mr. Stewart:
"* * * *
"The idea you have about making Billy [Hank Williams's reputed widow] a legal wife isn't bad at all but I fear that once you accept her as one she will try every *354 trick in the book. I keep thinking about the time when it will be necessary to renew copyrights on Hank's songs, as his legal wife she will be the one to do that unless of course that is one of the rights she gives up. Somehow I just can't picture her giving anything up.
"* * * *
"Thanks for sending the royalties check. It sure came in handy.... I want to thank you again for looking out for me. You know if mother adopts that child there will be a new will. Tee [Smith's husband] says that if she adopts it and then can't take care of it, he is not going to let me take it. Keep this under your hat, mabey [sic] it will never be necessary for me to have the child at all. I feel that the poor child would have a lot better chance in this life if it were adopted by someone that would never know of its origin at all. It won't be three years before someone will start telling it that it isn't exactly like other children. Oh, well I guess I sound like I just don't want mother to change her will but really that isn't it at all. I don't want a thing that we don't work for ourselves and whether or not I get that house or not doesn't bother me in the least. I am only thinking about that child. It may be the one thing that will help mother live to be a hundred[;] lets hope so. She seems to love it very much and will perhaps give it a wonderful chance."
Lillian Stone died on February 26, 1955. At that time, Smith became the administratrix of Hank Williams's estate and remained administratrix throughout the 1967 and 1968 litigation, until she relinquished her duties to Stewart in 1969. Also, after Lillian Stone's death, Smith and Stewart became directly involved in the decision-making process concerning the fate of the child. The record shows that after Smith refused to fulfill her previous commitment to care for the child in the event that it ever became necessary, she initiated procedures to make the child a ward of the State. She was successful in her efforts, in part, because Mr. Stone, Lillian Stone's spouse, was unable to care for the child alone. The records of the Montgomery Department of Public Welfare reflect these events, as follows:
"3/10/55
"Mr. Bob Stewart, lawyer for Mrs. Stone, [deceased], called Miss Rainer on this date and stated that Mrs. Stone's daughter, Irene Smith, would like to come to the office to discuss what would be best for Kathy Stone, the adopted daughter of Mrs. Stone....
"Later: Mr. and Mrs. Smith in office by appointment. Mrs. Smith stated that she felt that it would be for the best interest of Kathy if the child was placed for adoption and was no longer associated with Hank Williams' family. She explained that she and her husband were devoted to the child and would be perfectly willing to keep the child but feels that there would always be publicity and gossip connected with this baby. Mrs. Smith states that she knows she agreed to take Kathy in the event anything happened to her mother and that she is still willing to take the child but feels strongly that the child would always be subjected to ugly gossip and vicious rumors and would possibly be hurt very deeply in later years by this talk.
"Mr. and Mrs. Smith are at present living in Dallas, Texas, where Mr. Smith is in the Navy but Montgomery is their home and they plan to come back [here] in five (5) years when Mr. Smith can retire. They also plan to return to Montgomery each year for the Hank Williams Memorial and Mrs. Smith stated that she could just hear the tongues wagging now when Kathy would ride down the street in an automobile as part of the parade to commemorate Hank. For these reasons Mrs. Smith feels that Kathy could lead a much more normal life if she was placed for adoption with another family. Mrs. Smith seems to be very sincere and earnest in her opions [sic] about Kathy's future, and reiterated that she was not trying to get out of raising this child. She does not want this department to think that she is shirking her duty or ashamed to take the child and kept asking *355 if we did not agree that she was right in her way of thinking. Both Mr. and Mrs. Smith stated that if Montgomery were not their home and they did not plan to reside here permanently at the end of Mr. Smith's tour of duty with the Navy, that they would not hesitate to take Kathy and raise her as their own child. They feel that so many people know about the child however that whereever [sic] they might live, rumor and gossip would catch up with them and Kathy would always be affected by unfavorable publicity.
"We explained to Mr. and Mrs. Smith that as the adoption had been granted final, Mr. Stone was the legal parent ... and we wondered how Mr. Stone felt about placing the child for adoption. Both Mr. and Mrs. Smith stated that Mr. Stone was a very emotional person and he would like for the Smiths to take Kathy and rear her. They have not talked to him as yet about what would be best for Kathy but they feel that they would have a hard time making Mr. Stone see their point of view....
"At the present time, Kathy is staying part time with the Smiths and part time with Marie Glenn.... Mrs. Smith stated that Kathy was much happier with Marie than she was with the Smiths as she cried continuously while they had her. Mrs. Smith stated that Kathy was a very nervous child and seemed to miss Mrs. Stone a great deal. Mrs. Smith wondered if it was all right for Kathy to remain with Marie until other plans could be worked out. Worker told Mrs. Smith that we felt wherever the child was happiest would be all right until permanent plans could be made.
"... Mrs. Smith stated that she was very anxious to have the placement of the child settled as she had already received numerous telephone calls asking what would become of the child. She states that she did not realize so many people knew about this child but she has had telephone calls from Ohio and other various states regarding Kathy and who Kathy would live with now. Mrs. Smith seems to feel there will be a great deal of publicity regarding Kathy's placement. Mrs. Smith was assured that all of our dealings would be strictly confidential and it would be handled as quietly as possible....
"3/11/55
"Mr. and Mrs. Smith and Mr. Stone in office late in the afternoon. Mr. Stone apologized that he was in his work clothes and said that he came straight from work. Mrs. Smith stated that she had told Mr. Stone their feelings regarding their not taking Kathy and he seemed to understand. Mr. Stone stated that he could not possibly take care of Kathy and he guessed it would be best for her to be placed for adoption. Mr. Stone was quite emotional and cried but after a lengthy discussion stated again that he could see nothing else to do but have the child placed for adoption. He seemed sincere in his decision and signed a Boarding Home Agreement with this Department. We explained to Mr. Stone that we would make an appointment with him to go to the Juvenile Court to sign a Petition and would place Kathy in a boarding home until permanent plans could be made for the State to assume her custody.
"3/15/55
"Worker met Mr. Stone at the Juvenile Court after an appointment had been made. Mr. Stone told Mrs. Dees that he felt this was the best plan for Kathy although it hurt him very deeply to give her up. Mr. Stone was very emotional and cried during the interview....
"3/17/55
"Mrs. Smith in office by appointment as we explained that we would like as much background information on the alleged father of Kathy as possible as it would help in finding the most suitable home for the child. Mrs. Smith seemed to thoroughly understand and was quite willing to give any information and cooperate in every way. Mrs. Smith told us that Hank Williams was six feet, two inches (6' 2") tall, had a rather dark complexion which she would classify as almost olive. She said that she has the *356 same skin which worker would say was almost olive. Mr. Williams was a brunette with brown eyes. He attended school through the tenth grade but did not like school too well. She added that he was very capable and made excellent grades in the things that he liked. He started singing at the age of five (5) and started playing the guitar at age seven (7). Mrs. Smith stated that she would consider her brother a musician, poet, composer, and philosopher."
On April 22, 1955, less than two months after Lillian Stone's death, Stone was made a ward of the State.
The record shows that Stewart acted as the attorney for the estate as early as 1953 and that Smith became the administratrix in 1955, but neither apprised the court of the evidence of the child, despite their intimate knowledge of her claims as a potential heir to the estate and as a possible creditor under the terms of the agreement to provide support. The following letter, dated February 28, 1962, written to Stewart by attorney Harold Orenstein, legal counsel for Wesley Rose, shows Stewart's knowledge of Stone's potential right to share in her father's copyright renewals:
"... From the documents which you have furnished to me, Catherine Yvonne Stone (born Antha Belle Jett) was returned to the State of Alabama Welfare department after the death of Lillian Stone, and then re-adopted by persons unknown. Nowhere in the documents is there an indication of the names of the natural parents of Catherine Yvonne Stone. We assume that these documents were the ones that you mentioned had been sealed and could never be re-opened. However, we note that the child was given a certain sum of money for its `homestead' rights in the property of Lillian Stone.... It would seem that some token payment to the State of Alabama Welfare Department again on behalf of this child may or may not be indicated (depending upon your viewing of the Alabama law). There is no way of evaluating now what a share of the renewal copyrights would be worth and no one could predict their valuation. We feel that a nominal payment might forever cut off the right of this child to the renewals. We should like to have further comment from you regarding the foregoing.
"... I shall confer with Wesley [Rose] after he has received [a] copy of this letter and, after having heard from you regarding Catherine Yvonne Stone, proceed to draw up an agreement which we can present both to the courts and to Audrey Williams." (Emphasis added.)
In a second letter, dated July 5, 1962, Stewart responded:
"None of this would seem to affect the child's statutory right to copyright renewal....
"... Since the statutory right of the child comes to it through its father, and since the federal courts have held this right belongs to an illegitimate, we may be faced with a difficult problem, and certainly one we would not want to litigate.

"As possible alternatives we can:
"a. Consider that by the adoption all rights under the renewal statutes have been lost.
"b. Try to explain the matter to our Welfare Department, which does not want the child ever to know its background, but which would probably feel a duty to protect any right the child might have, and hope for a cooperative settlement and court approval.

"c. Petition the court for approval of an agreement between Acuff-Rose and the Guardian, requesting that a guardian ad litem be appointed for Randall and another for all other possible minors who might claim a similar renewal right. If we use this procedure, the guardian ad litem will have to be told what we are talking about, and might be vigorous in asserting this right. Much would depend on the person appointed, over which we have no control.

"I do not believe we can make a token payment to the Welfare Department since any payment which would bar a *357 later claim would have to be made with an understanding of the facts by the court. My alternatives are not much better, but perhaps you can improve on them with a little thought." (Emphasis added.)
No proceedings concerning the estate of Hank Williams were ever instituted on behalf of the Stone child. However, as stated earlier, in 1967, when Audrey Williams petitioned the court for final settlement of the estate on behalf of Williams, Jr., Smith, as administratrix, finally advised the court that there might possibly be an illegitimate child of the deceased somewhere, and the court then appointed Drayton Hamilton to serve as the child's guardian ad litem in both the 1967 and 1968 proceedings.[8]
The record shows that during the 1967 proceedings, Hamilton called Stewart to testify concerning his knowledge of the circumstances surrounding the child's claim to the estate. Again, despite Stewart's extensive knowledge of these circumstances from his involvement with the child's father, mother, grandmother, and aunt, he revealed nothing, with the sole exception of producing the original custody and support agreement. Certainly he did not reveal the contents of all the correspondence and information he knew concerning Stone's adoption and the information furnished to the Department of Pensions and Security. Smith, too, aside from advising the court of the existence of the child, remained silent about what she knew.
Stewart's plan, as proposed in his July 5, 1962, letter to Wesley Rose's attorney, suggested that the person appointed as guardian ad litem "might be vigorous in asserting this right [to copyright renewals]." Hamilton was vigorous. He fought for the child's rights, even without material evidence concerning her paternity. Hamilton argued that Hank Williams had accepted the child as his own and had made legal arrangements to have full custody and control of the child, and that if the law did not recognize her right to inherit simply because she was illegitimate, then the law was unconstitutional and should be changed.[9] Despite Hamilton's efforts, with the evidence that it had before it at the time, the trial court ruled against the child in both the 1967 and 1968 proceedings.[10] *358 Hamilton, then as the guardian ad litem, requested permission to appeal the rulings on behalf of the child, but the court refused to grant permission. Thus, Hamilton's court-appointed representation of the Stone child ended, and nothing further was done on her behalf.[11]
Despite the court's rulings in the 1967 and 1968 proceedings, when Stewart became the administrator of the estate in 1969, he began setting aside a share of the estate for Stone. During that time, in a series of letters to the attorney for Williams, Jr., Stewart wrote that "the last two distributions to Randall ... were actually an encroachment on the one-half of the Estate which could conceivably be claimed by the child." Stewart's concealment with regard to the Stone child continued, and in April 1974 he alerted counsel for Williams, Jr., that Stone had traveled to Montgomery and claimed her homestead that had been set aside for her in the Lillian Stone estate. Stewart wrote: "[Her] ancestry may well be reasonably obvious to her, and further trouble may ensue." However, the estate of Hank Williams was closed in August 1975, without further incident, and the money that Stewart had been setting aside for Stone was distributed along with the other assets of the estate.
The law in Alabama concerning legal fraud has been stated by this Court as follows:
"To constitute fraud, in its legal signification, it is not necessary that one intend to injure another....
"`If fraud is proved the law will infer an improper motive, and the actual motive of the speaker is immaterial. In other words, it is not essential that the [misrepresentor] be motivated by a desire to injure complainant or to benefit himself; and it makes no difference that his motive was solely to benefit a third person.'"
Duncan v. Johnson, 338 So.2d 1243, 1250 (Ala.1976) (quoting C.J.S. Fraud § 26). With regard to fraud on the court, this Court has further recognized the following principles:
"`[Where] the fraud itself [is] to be consummated through the instrumentality of a court of justice, the protection of the court demands that there should be a remedy. We can conceive of no worse reflection upon a judicial system, no lowering of its dignity and of the respect due to its findings more regrettable than that the tribunal of justice may become an impotent agency of fraud against those who look to it for protection and who are free from fault....'"
Duncan, 338 So.2d at 1251 (quoting Bolden v. Sloss-Sheffield Steel & Iron Co., 215 Ala. 334, 335, 110 So. 574, 575 (1925)). Stated differently:
"`Where [fraud] relates to the conduct of the suit, as where it prevents a party from asserting his rights, there is no fair adversary proceeding, and equity will interfere.'"
Eskridge v. Brown, 208 Ala. 210, 211, 94 So. 353, 354 (1922) (quoting 6 Pom. Eq. Jur. at 1092) (emphasis added).
The idea that as an attorney, Stewart had a fiduciary relationship with the estate of Hank Williams, his client, is elementary. See Jones v. Caraway, 205 Ala. 327, 87 So. 820, (1921); Kidd v. Williams, 132 Ala. 140, 143, 31 So. 458 (1901); and Yonge v. Hooper, 73 Ala. 119 (1882). In Yonge, this Court recognized that
"[an] [a]ttorney and client sustain to each other the severe relation of trustee and cestui que trust, and their dealings together are subject to the same intendments and imputations, as those which *359 obtain between other trustees and their beneficiaries." Yonge, 73 Ala. at 121.
Furthermore, Stewart, as administrator, and Smith, as administratrix, held the position of a trustee, and their administration of the estate was that of a trust. See Clark v. Clark, 287 Ala. 42, 47, 247 So.2d 361, 365 (1971); Keith & Wilkinson v. Forsythe, 227 Ala. 555, 557, 151 So. 60, 61 (1933). In Maryland Casualty Co. v. Owens, 261 Ala. 446, 451, 74 So.2d 608, 612 (1954), this Court recognized that
"[a]n executor occupies a position of trust with respect to those interested in the estate and is the representative of the decedent, of creditors and of the legatees and distributees."
(Citing Durden v. Neighbors, 232 Ala. 496, 168 So. 887, 889 (1936); and Amos v. Toolen, 232 Ala. 587, 168 So. 687, 692 (1936).) At the time this estate was being administered, the law of Alabama imposed the following requirements upon an administrator:
"In making settlements of an administration, the executor or administrator must proceed as follows:
"* * * *
"He must, at the same time, file a statement, on oath, of the names of the heirs and legatees of such estate, specifying particularly which are under the age of twenty-one years...."
Tit. 61, § 295, Code of Alabama, 1940, presently Code 1975, § 43-2-502. This Court has held that an administrator who knowingly and willingly conceals from the court administering an estate the name of an heir or distributee, is guilty of such a fraud on the court as to authorize a court of equity to set the decree of settlement aside. See Fidelity & Deposit Co. of Maryland v. Hendrix, 215 Ala. 555, 112 So. 117 (1927); and cf., Leflore By and Through Primer v. Coleman, 521 So.2d 863 (Miss.1988); Smith By and Through Young v. Estate of King, 501 So.2d 1120 (Miss.1987); Matter of Estate of Flowers, 493 So.2d 950 (Miss.1986).
We recognize, generally, that mere silence does not constitute fraud; however, a different rule applies where confidential relations or particular circumstances exist. Code 1975, § 6-5-102, provides:
"Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." (Emphasis added.)
Furthermore, it has been recognized that
"[a] fiduciary duty need not spring from a legal relation but may arise from a relation which is merely moral, social, domestic, or purely personal in character, and that fiduciary relations embrace not alone the obviously confidential relations such as attorney and client, principal and agent, guardian and ward, and the like, but also every relation in which as matter of fact there is confidence reposed on one side and a resultant domination and influence on the other."
17 C.J.S. Contracts, § 154 at 911 (1963).
In the present case, both Stewart and Smith had a legal obligation, as either the attorney or administrator of the estate or because of the particular circumstances involved, to advise the court at the earliest possible date that the Stone child existed and possessed potential claims to the estate as an heir, being a natural child of the deceased, and as a creditor under the child support agreement. Because the corpus of the estate involved copyright renewals, and because illegitimates could share in such rights under federal law, the "particular circumstances" of this case make the legal obligation a weightier one. The evidence shows that Stewart, as administrator, and as attorney for Smith, knew that the child had a substantial claim to the copyright renewals.[12] Except for efforts by guardian ad litem Hamilton, no effort on behalf of Stone was made to establish her right to inherit or to establish her contract claim for child support under the 1952 agreement. Likewise, because all of the *360 material circumstances surrounding her paternity were never made known to the court in the ancillary proceedings brought on behalf of Williams, Jr., Stone never received a "fair adversary proceeding," to which she was entitled by law. See Eskridge, 208 Ala. 210, 211, 94 So. 353, 354 (1922).[13]
Whether Stewart and Smith intended to deceive the court or merely sought to protect their own interests or the interests of Williams, Jr., or any other parties interested in the estate, or whether they intended to injure the Stone child is immaterial. Inasmuch as they remained silent about material facts concerning the Stone child, known to them, upon which the law imposed a legal duty to communicate, their actions constituted legal fraud. See Code 1975, § 6-5-102, formerly Tit. 7, § 109, Code of Alabama, 1940.
Further, it would appear that Smith's eventual notification to the court about the agreement, in 1967, was not for the purpose of showing Stone's right to share in the estate, but, rather, for the opposite purpose of showing that she had no right to share in the estate.[14] In her answer to the 1967 action, Smith responded that "she believes Randall Hank Williams is the sole heir of his father, Hiriam `Hank' Williams,...; however, in the possession of the administratrix are certain documents which may give rise to or affect the rights of another minor to share in said estate...." That answer was prepared by Stewart, who at that time was aware that the copyright laws allowed illegitimates to inherit.
We cannot say that Smith's and Stewart's concealment did not affect the judgments ultimately rendered in the 1967 and 1968 proceedings, which denied Stone any right in her natural father's estate. While we recognize that the law in Alabama at that time was unfavorable to illegitimate children with regard to intestate succession from their fathers, we cannot say that Stone would not have prevailed upon appeal, because of the strong statements made in Levy v. Louisiana, which was extant at the time the appeal would have been pending had one been filed. In short, this Court very well could have reached the result it reached later in the case of Everage v. Gibson, 372 So.2d 829 (Ala.1979), cert. denied, 445 U.S. 931, 100 S.Ct. 1322, 63 L.Ed.2d 765 (1980), and could have recognized Stone's right, as the natural child of Hank Williams, to inherit from his estate. Because of the circumstances surrounding the 1967 and 1968 decrees, there are grounds for setting them aside, at least in part, for the reasons we shall hereinafter state.

Error of Law
At this time, we address another circumstance bearing on the validity of the 1967 and 1968 judgments. The record shows that after the trial court ruled against Stone in both proceedings, Hamilton, as her guardian ad litem, requested permission to appeal the rulings on her behalf. Even though Judge Emmet thought the law was wrong, he denied Hamilton permission to appeal. After being denied the right to appeal, Hamilton did nothing further on her behalf.
Under the law as it exists today and as it was at the time of the proceedings in question, Stone, or her guardian ad litem acting on her behalf, had the right to appeal the trial court's adverse ruling to this Court. Title 7, § 754, Code of Alabama, 1940 (Recompiled *361 1958) (now, Code 1975, § 12-22-2) provided for appeals from the circuit court to the Supreme Court, as follows:
"From any final judgment or decree of the circuit court, or courts of like jurisdiction, or probate court, except in such cases as are otherwise directed by law, an appeal lies to the supreme court, for the examination thereof as matter of right, on the application of either party, or his personal representative; and the clerk, register, or judge of probate, must certify the fact that such appeal was taken, and the time when, as part of the record, which gives the supreme court jurisdiction of the case." (Emphasis added).
In addition, Tit. 7, § 786, Code of Alabama 1940 (Recompiled 1958), provided that "a guardian ad litem may take and prosecute an appeal without giving any security for costs of the appeal, and shall not be liable personally for costs of appeal."
In the present case, after the trial court refused to grant permission to appeal the adverse ruling, Hamilton understandably considered his representation of the child ended. The general rule is that "[a] guardian ad litem or next friend is always subject to the supervision and control of the court, and he may act only in accordance with the instructions of the court." 43 C.J.S. Infants § 234, p. 610 (1978). Furthermore, at the time of these proceedings, this Court had construed Tit. 7, § 786, to hold that a guardian ad litem was personally liable for the costs of an appeal taken from a decree of the probate court, if the judgment of the lower court was affirmed. See Ward v. Mathews, 122 Ala. 188, 25 So. 50 (1898).
Because Stone was a ward of the court, it was the duty of the court, even though it had appointed a representative for Stone, to protect her rights and interests, on its own motion.[15] See 43 C.J.S. Infants, § 220, p. 564; see also Fletcher v. First Nat'l Bank of Opelika, 244 Ala. 98, 11 So.2d 854 (1943) (which recognized that a court of equity is the guardian of all infants within its jurisdiction). Therefore, there can be no question that the trial court's refusal to allow Stone to utilize her right to appeal constituted an error of law, especially when the judge's order that disallowed her claim stated on its face that he did not consider it to be in her best interest.
Code 1975, § 12-11-60, formerly Code 1940, Tit. 13, § 145, provides:
"(a) When any error of law or fact has occurred in the settlement of any estate of a decedent to the injury of any party, without any fault or neglect on his part, such party may correct such error by filing a complaint in the circuit court within two years after the final settlement thereof....
"(b) The limitations of subsection (a) of this section do not extend to infants or persons of unsound mind who are allowed two years after the termination of their respective disabilities, but in no case to exceed 20 years."[16]
Under this section, an error of law is sufficient to warrant modification of the judgment rendered in the shadow of that error, *362 even in the absence of fraud. See Maryland Casualty Co. v. Owens, 261 Ala. 446, 450, 74 So.2d 608, 610-11 (1954).
Similarly, Rule 60(b)(6), Ala.R.Civ.P., provides that the court may relieve a party from the operation of a final judgment for any reason justifying such relief. An error of law, such as the one committed by the trial court in the 1967 and 1968 proceedings involving this estate, and that error's attendant consequences, would certainly appear to justify relief under this rule.
Therefore, even absent a finding that the judgments rendered against Stone in 1967 and 1968 were tainted by legal fraud, we would be compelled by the serious nature of the error committed by the trial court in those proceedings to revisit the judgments and modify their operation with respect to her rights, especially since the beneficiaries of those decrees and of the subsequent final settlement are the same individuals who were attempting to secure a judicial determination that would bar her right to share in copyright renewals. At the very least, this error of law aborted any res judicata effect of the 1967 and 1968 decrees.

Timeliness
Having found merit in Stone's claim that the 1967 and 1968 judgments rendered against her should be set aside, we now address whether her delay in asserting that claim was reasonable.[17] Her claim, being equitable in nature, is governed by the doctrine of laches.
The doctrine of laches is purely equitable in nature and may be invoked to deny equitable relief to one guilty of unconscionable delay in asserting a claim. See United States v. Olin Corp., 606 F.Supp. 1301, 1309 (N.D.Ala.1985). However, this Court has recognized that the mere lapse of time alone does not establish laches. See Davis v. Thomaston, 420 So.2d 82, 84 (Ala.1982). Rather, the question of laches is one that must be decided upon the peculiar facts and circumstances of each case. See Lindley v. Lindley, 274 Ala. 570, 575, 150 So.2d 746, 750 (1963); and Jones v. Boothe, 270 Ala. 420, 424, 119 So.2d 203, 207 (1960). In Multer v. Multer, 280 Ala. 458, 462, 195 So.2d 105, 109 (1966), this Court recognized that
"`[l]aches is not fixed by a hard and fast limit of time, but is a principle of good conscience dependent on the facts of each case.'"
(Quoting Woods v. Sanders, 247 Ala. 492, 496, 25 So.2d 141, 144 (1946)). In addition, this Court has held that a party will not be estopped from asserting a fact of which he was ignorant, if upon discovery of that fact, he promptly seeks relief. See Duncan v. Johnson, 338 So.2d 1243, 1254 (Ala. 1976). Stated differently, the doctrine of laches will not apply in the absence of information and knowledge sufficient to put one on notice of a claim. Id.; see also Sims v. Lewis, 374 So.2d 298, 305 (Ala. 1979); and Cotney v. Eason, 269 Ala. 354, 357, 113 So.2d 512, 516 (1959). The law recognizes that for the doctrine of laches to apply, the party claiming the right must have failed to do something that equity would have required him to do. See Olin Corp., 606 F.Supp. at 1309; and Sims, 374 So.2d at 305.
In the present case, the estate of Hank Williams was not finally closed until August 1975. The record shows that only one year earlier, in 1974, was the truth of Stone's paternity first suggested to her, and, at that time, it appears to have been presented merely as theory or speculation. Before 1974, for personal reasons, Stone's adoptive parents had vowed that she never know the identity of her natural father, and it appears that they were successful in concealing this information from her. The record also shows that at the early age of three, Stone had been transferred from Montgomery, permanently, to an adoptive home in Mobile, which effectively removed her from any persons who might have known her identity. In addition, as previously discussed, the record is quite clear *363 that the attorney and administratrix of the estate and others did all that they could, including committing legal fraud, to ensure that she never discover her identity or any facts material to her claim, and the record shows that the State of Alabama, acting through the Department of Pensions and Security, and the courts essentially contributed to the concealment of her parenthood, although aware of it. Any public records or documents that might have led to her discovery of her paternity at an earlier date had been ordered sealed by the court from the time that she was a small child. Upon retrieving these sealed documents in 1985, Stone promptly made a demand for her share, and the plaintiffs instituted this action for a determination of her rights in view of the prior judgments.[18] Based on all of these considerations, we conclude that her attack on, and request for relief from, the prior judgments rendered in this matter are not time-barred.

Intestate Succession and the Illegitimate Child
Having found that the judgments rendered against Stone in the 1967 and 1968 proceedings may be set aside with respect to her right to share in the estate, and, furthermore, having found that her claim to set aside those judgments is not time-barred, we hold that she presented evidence that she was entitled to a determination of her rights, and to reopen the estate, as she requested in her third-party complaint. Therefore, the trial court erred in entering summary judgment on her claim. Because the entire record is before this Court, even though an appeal was not taken from the other judgments, in the interest of judicial economy, we will now address those rights rather than remand the cause to the trial court.
The law concerning the right of an illegitimate child to inherit through intestate succession has seen many changes over the years. At common law, an illegitimate child, who had not been legitimated, was considered the child of no one and could inherit from no one. See Williams v. Witherspoon, 171 Ala. 559, 55 So. 132 (1911). The courts considered an illegitimate child "nullius filius," the "heir to nobody," and thus, the child "ha[d] no ancestor from whom any inheritable blood [could] be derived." Lingen v. Lingen, 45 Ala. 410, 413 (1871) (quoting 1 Wendell's Blackstone, 459).
By 1929, in the case of Moore v. Terry, 220 Ala. 47, 124 So. 80 (1929), overruled in part by Everage v. Gibson, supra, this Court had recognized that an illegitimate child, who had not been legitimated, could inherit from his mother, but not from his father, even if paternity was shown. This change was also reflected in Code 1940, Tit. 16, § 6, which provided that "[e]very illegitimate child is considered as the heir of his mother, and inherits her estate in whole or in part, as the case may be, in like manner as if born in lawful wedlock." Later, in Hudson v. Reed, 259 Ala. 340, 66 So.2d 909 (1953), this Court described the common law rule as a "harsh rule," and held that an illegitimate child, because of this statute, could inherit not only from his mother but also through his mother.
Between 1929 and 1979, however, the law in Alabama recognized only the following *364 two methods by which an illegitimate child could be legitimated in order to inherit from its father through intestate succession: 1) by marriage of the parents, accompanied by the father's recognition of the child; or 2) by a written declaration, attested by two witnesses, and filed with the judge of probate.[19] See Moore, 220 Ala. 47, 124 So. 80 (1929); see also Code 1923, §§ 9299, 9300, later codified at Code 1940, Tit. 27, §§ 10, 11, and Code 1975, §§ 26-11-1, 26-11-2.
Additionally, there were statutes in effect at the time of Stone's birth that provided that a father of an illegitimate child could be required to support the child, even though there had been no formal adjudication of paternity. See Code 1940, Tit. 34, §§ 89, 90. Under these provisions, a charge of nonsupport against the putative father could be sustained, even if he had not been adjudicated the father, if the putative father had publicly acknowledged or treated the child as his own in a manner to indicate his voluntary acknowledgement of parenthood. See Law v. State, 238 Ala. 428, 191 So. 803 (1939). These statutes evidence the policy of the law to compel the father of an illegitimate child to support that child if the father had voluntarily acknowledged his parenthood, as Hank Williams did here.[20]
After the United States Supreme Court decided the cases of Trimble v. Gordon, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), and Lalli v. Lalli, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978),[21] Alabama's law concerning the right of an illegitimate child to inherit from its father changed dramatically. In Trimble, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), the Court found an Illinois statute, much like Alabama's Code 1975, §§ 26-11-1 and 26-11-2, which set forth the two *365 methods of legitimation discussed above, to be unconstitutional under an equal protection challenge. The Court stated the following:
"`The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectualas well as an unjustway of deterring the parent.'"
Trimble, 430 U.S. at 769, 97 S.Ct. at 1464 (quoting Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 175, 92 S.Ct. 1400, 1406, 31 L.Ed.2d 768 (1972)). In Lalli, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978), the United States Supreme Court upheld, as constitutional, a similar New York statute because it provided that an illegitimate child could inherit from its father if there had been a judicial determination of paternity before the father's death.
In Lalli, Mr. Justice Powell, while recognizing, however, the importance of the competing state interest in the just and orderly administration of decedents' estates, stated as follows:
"The primary state goal underlying the challenged aspects of § 4-1.2 is to provide for the just and orderly disposition of property at death. We long have recognized that this is an area with which the States have an interest of considerable magnitude. Trimble, [430 U.S. 762 (1977) ] at 771 [97 S.Ct. at 1465]; Weber v. Aetna Casualty & Surety Co., 406 U.S. at 170 [92 S.Ct. at 1404]; Labine v. Vincent, 401 U.S. [532] at 538 [91 S.Ct. 1017, 1020, 28 L.Ed.2d 288]; see also Lyeth v. Hoey, 305 U.S. 188, 193 [59 S.Ct. 155, 158, 83 L.Ed. 119] (1938); Mager v. Grima, 8 How. [49 U.S.] 490, 493 [12 L.Ed. 1168] (1850).
"This interest is directly implicated in paternal inheritance by illegitimate children because of the peculiar problems of proof that are involved. Establishing maternity is seldom difficult. As one New York Surrogate's Court has observed: `[T]he birth of the child is a recorded or registered event usually taking place in the presence of others. In most cases the child remains with the mother and for a time is necessarily reared by her. That the child is the child of a particular woman is rarely difficult to prove.' In re Ortiz, 60 Misc.2d 756, 761, 303 N.Y.S.2d 806, 812 (1969). Proof of paternity, by contrast, frequently is difficult when the father is not part of a formal family unit. `The putative father often goes his way unconscious of the birth of a child. Even if conscious, he is very often totally unconcerned because of the absence of any ties to the mother. Indeed the mother may not know who is responsible for her pregnancy.' Ibid....; accord, In re Flemm, 85 Misc.2d 855, 861, 381 N.Y.S.2d 573, 576-577 (Surr.Ct. 1975); In re Hendrix, 68 Misc.2d, [439] at 443, 326 N.Y.S.2d, [646] at 650 [(1971)]; cf. Trimble, supra, [430 U.S.] at 770, 772 [97 S.Ct. at 1465, 1466]."
439 U.S. at 268-69, 99 S.Ct. at 524-25 ("who" emphasized in original; other emphasis added).
Further, Mr. Justice Powell quoted extensively from In re Flemm, 86 Misc.2d 855, 381 N.Y.S.2d 573 (N.Y.Sur.1975), as follows:
"`An illegitimate, if made an unconditional distributee in intestacy, must be served with process in the estate of his parent or if he is a distributee in the estate of the kindred of a parent.... And, in probating the will of his parent (though not named a beneficiary) or in probating the will of any person who makes a class disposition to "issue" of such parent, the illegitimate must be served with process.... How does one cite and serve an illegitimate of whose existence neither family nor personal representative may be aware? And of great concern, how achieve finality of decree in any estate when there always exists the possibility however remote of *366 a secret illegitimate lurking in the buried past of a parent or an ancestor of a class of beneficiaries? Finality in decree is essential in the Surrogates' Courts since title to real property passes under such decree. Our procedural statutes and Due Process Clause mandate notice and opportunity to be heard to all necessary parties. Given the right to intestate succession, all illegitimates must be served with process. This would be no real problem with respect to those few estates where there are "known" illegitimates. But it presents an almost insuperable burden as regards "unknown" illegitimates. The point made in the [Bennett] commission discussions was that instead of affecting only a few estates, procedural problems would be created for manysome members suggested a majorityof estates.' 85 Misc.2d, at 859, 381 N.Y.S.2d, at 575-576."
439 U.S. at 270, 99 S.Ct. at 525 (emphasis added).
Recognizing a different view in Pickett v. Brown, 462 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983), the United States Supreme Court, in holding a Tennessee statute of limitations involving illegitimate children unconstitutional, stated:

"In view of the history of treating illegitimate children less favorably than legitimate ones, we have subjected statutory classifications based on illegitimacy to a heightened level of scrutiny. Although we have held that classifications based on illegitimacy are not `suspect,' or subject to `our most exacting scrutiny,' Trimble v. Gordon, [430 U.S. 762 (1977) ], at 767 [97 S.Ct. 1459, 1465, 52 L.Ed.2d 31]; Mathews v. Lucas, 427 U.S., [495] at 506 [96 S.Ct. 2755, 2762, 49 L.Ed.2d 651], the scrutiny applied to them `is not a toothless one....' Id., at 510 [96 S.Ct. at 2664]. In United States v. Clark, [445 U.S. 23, 100 S.Ct. 895, 63 L.Ed.2d 171 (1980)], we stated that `a classification based on illegitimacy is unconstitutional unless it bears "an evident and substantial relation to the particular... interest [the] statute is designed to serve."' 445 U.S., at 27 [100 S.Ct. at 899]. See also Lalli v. Lalli, [439 U.S. 259 (1978) ], at 265 [99 S.Ct. 518, 523, 58 L.Ed.2d 503] (plurality opinion) (`classifications based on illegitimacy ... are invalid under the Fourteenth Amendment if they are not substantially related to permissible state interests'). We applied a similar standard of review to a classification based on illegitimacy last Term in Mills v. Habluetzel, 456 U.S. 91 [102 S.Ct. 1549, 71 L.Ed.2d 770] (1982). We stated that restrictions on support suits by illegitimate children `will survive equal protection scrutiny to the extent they are substantially related to a legitimate state interest.' Id., at 99 [102 S.Ct. at 1554].
"Our decisions in Gomez [v. Perez, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973)] and Mills are particularly relevant to a determination of the validity of the limitations period at issue in this case. In Gomez we considered `whether the laws of Texas may constitutionally grant legitimate children a judicially enforceable right to support from their natural fathers and at the same time deny that right to illegitimate children. 409 U.S., at 535 [93 S.Ct. at 872]. We stated that `a State may not invidiously discriminate against illegitimate children by denying them substantial benefits accorded children generally,' Id., at 538 [93 S.Ct. at 875], and held that `once a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother.' Ibid. The Court acknowledged the `lurking problems with respect to proof of paternity,' ibid., and suggested that they could not `be lightly brushed aside.' Ibid. But those problems could not be used to form `an impenetrable barrier that works to shield otherwise invidious discrimination.' Ibid." (Emphasis added.)
462 U.S. at 8-9, 103 S.Ct. at 2204.
Consequently, in 1979, this Court, in the case of Everage v. Gibson, 372 So.2d 829 *367 (Ala.1979), cert. denied, 445 U.S. 931, 100 S.Ct. 1322, 63 L.Ed.2d 765 (1980), in order to avoid finding Alabama's statutory scheme for intestate succession unconstitutional, construed it to include a third method of legitimation, i.e., a judicial determination of paternity made within two years of birth and during the father's lifetime. The Everage Court gleaned this third method from the child support statutes found at Code 1975, § 26-12-1 et seq. In 1982, the Alabama legislature superseded Everage and wrote this procedure into the Probate Code itself, in § 43-8-48, which provides that an illegitimate child is considered to be the child of the father if the parents marry or if paternity is established by an adjudication before the death of the father or thereafter by clear and convincing proof.[22] Then, in addition, in 1984, the legislature repealed Code 1975, § 26-12-1 et seq., and replaced those sections with the Alabama Uniform Parentage Act, found at Code 1975, § 26-17-1 et seq. Like the child support statutes it replaced, the AUPA sets forth a mechanism whereby a judicial determination of paternity can be made. Therefore, there are presently two statutory schemes for judicial determination of paternity, one in the Probate Code and one in the AUPA.
Under the law as it exists today, there can be no question that where, as in this case, paternity has been established by clear and convincing evidence,[23] the law recognizes the right of the child to inherit through intestate succession. In brief response to the argument that Stone is barred from establishing her rights in the estate by operation of the doctrines of res judicata and collateral estoppel, we note the following. First, with regard to the issue of Stone's paternity, it is clear from the record that this issue was not adjudicated in the 1967 and 1968 proceedings. The court stated that it "[did] not believe that it [was] necessary to make this ... determination." Furthermore, the issue of Stone's paternity was not appealed to this Court, and therefore, no arguments concerning the issue of her paternity are material. Finally, as for the issues regarding Stone's rights that were adjudicated in the 1967 and 1968 proceedings, the fact that those determinations were influenced by legal fraud on the court renders the doctrines of res judicata and collateral estoppel inapplicable, especially in this case, which involves the illegitimate child's right to share in the proceeds of copyright renewals that admittedly would have been payable to her as an illegitimate had her paternity not been concealed. See Code *368 1975, § 43-8-48; and Cotton v. Terry, 495 So.2d 1077 (Ala.1986). We recognize that the law at the time of her father's death had not yet recognized the third method of legitimation for the purpose of intestate succession, i.e., a judicial determination of paternity; however, we also recognize that the law as it existed at that time has since been found to be unconstitutional by the United States Supreme Court in Trimble v. Gordon, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), and by this Court in Everage v. Gibson, 372 So.2d 829 (Ala. 1979).
In an action, such as the present one, that is not time-barred and is properly before this Court, we are bound to apply a constitutional law as it exists at the time the appeal is heard. This situation has been addressed by this Court and the Court of Civil Appeals in the cases of Cotton v. Terry, 495 So.2d 1077 (Ala.1986); Abrams v. Wheeler, 468 So.2d 126 (Ala.1985); and Free v. Free, 507 So.2d 930 (Ala.Civ.App. 1986).
In Cotton, 495 So.2d 1077 (Ala.1986), an illegitimate child brought an action to establish paternity under Code 1975, § 43-8-48(2)(b), 11 years after the death of the alleged father. In construing § 43-8-48(2)(b), this Court held:
"[I]t may be seen from the plain language of the statute that paternity of an illegitimate child may be established after the death of the father through an adjudication supported by clear and convincing evidence. When so established, such a child may inherit from the father through intestate succession." (Second emphasis added.)
Cotton, 495 So.2d at 1079. In Cotton, as in the present case, there was clear evidence that the alleged father recognized the child as his and held himself out as the child's father. Yet, in Cotton, as in the present case, the law at the time of the alleged father's death would not have recognized the child as an heir. Even so, this Court did not apply an unconstitutional law to the parties, but, rather, applied the law as it existed at the time of the appeal. Also, in Abrams v. Wheeler, 468 So.2d 126 (Ala.1985), an illegitimate child brought a paternity action before the death of the father, but after the expiration of the two-year limitations period that had been adopted in Everage, 372 So.2d 829 (Ala. 1979). However, this Court refused to apply the two-year limitations period because it had since been found to be unconstitutional. Instead, it applied the law as it existed at the time of the appeal, and found the action not time-barred. Again, in Free v. Free, 507 So.2d 930 (Ala.Civ.App.1986), an illegitimate child brought an action under § 43-8-48(2)(b), not only after the death of the father, but also 20 years after the child had reached the age of majority. Despite the arguments by the legitimate heirs, the Court of Civil Appeals refused to apply the law in effect at the time of the death of the father or at the time of the birth of the child because that law had since been found unconstitutional.[24]
To the extent that there remains a question of the effect of a subsequent adoption on the right to establish paternity, we address that issue briefly. Code 1975, § 43-8-48(1), part of the Probate Code, states:
"An adopted person is the child of an adopting parent and not of the natural parents...."
In addition, Code 1975, § 26-17-6(e), part of the Alabama Uniform Parentage Act, provides:
"If the child has been adopted, an action [to establish paternity under this section] may not be brought."
The trial court in the 1968 proceedings was erroneously of the opinion that the fact that Stone had twice been adopted acted as a bar to her recovery under the predecessors to these statutes. The crucial fact that the trial court failed to recognize in *369 this case was that Stone had not been adopted at the time of her natural father's death. Therefore, any right that she had to inherit from his estate would have vested at the time of his death and would not have been affected by her subsequent adoption some two years later.
We do not believe that, in drafting these statutes, the legislature intended to cut off the right of an "after-adopted" child to inherit from its natural parent's estate.[25] Construing these statutes liberally, in order to further the trend of ameliorating the "harsh rule" of the common law, which had been overturned in 1968 by the United States Supreme Court, and which had been criticized by this Court and by the trial court in 1968, we believe that these statutes are to be read to protect, rather than cut off, an "after-adopted" child's right to inherit from its natural parents. We hold, therefore, that because Stone had not been adopted at the time of her natural father's death, her rights in his estate had already vested, and, therefore, these statutes do not apply.[26]

Relief Granted
We have noted throughout this opinion the unique character of this case. In fashioning an appropriate remedy, we again take these peculiar circumstances into consideration.
This Court is ever mindful of the policy concerns surrounding the finality of judgments. At the same time, we cannot ignore the pleas for relief of an innocent party who has labored under judgments procured by legal fraud and suppression, and based upon a completely erroneous view of the applicable law, at a time when she was not only a minor but had no one except a guardian ad litem fighting for her rights, and he was effectively foreclosed from establishing them.
We further recognize that when an illegitimate child and a decedent's estate are involved, as is the case here, the law must protect two additional state intereststhe right of the illegitimate child to inherit on a par with any legitimate children, and the important state interest in the just and orderly disposition of the decedent's estate.
We also recognize that
"`where the rights and obligations of the parties are necessarily blended in the judgment, and are thus dependent one upon the other, though they be not strictly joint, the appellate court will render such judgment as will permit and require the entire controversy to be settled in one proceeding, in which the rights and liabilities of all parties may be considered and consistently determined.'"
City of Tuscaloosa v. Fair, 232 Ala. 129, 136-37, 167 So. 276, 282 (1936), overruled in part on other grounds by Jacks v. City of Birmingham, 268 Ala. 138, 105 So.2d 121 (1958) (quoting North Alabama Traction Co. v. Hays, 184 Ala. 592, 596 64 So. 39, 40 (1913). In view of all of the evidence in this case relating to concealment by the attorney and the administratrix of the estate of Stone's claims to the estate and of facts material to those claims, in addition to the fact that the state agencies involved, as well as the court itself, failed to protect her rights, we cannot but conclude that equity and justice require that the 1967 and 1968 decrees rendered in this matter be set aside, in part. Accordingly, in order to balance all of the equities involved in this case, we hereby reverse the summary judgment on Stone's third-party claim in which she asked that the estate be reopened, and we order that the 1967 and 1968 judgments rendered in this matter be set aside, in part, and that Stone is entitled to receive her proportionate share of any proceeds of the estate of her natural father, Hank *370 Williams, including any income or interest, and of any copyright royalties, but prospectively only, from the date that she gave notice of her claim, August 5, 1985. The trial court's judgment which, insofar as it denied her request for punitive damages against the third-party defendants, is affirmed.
While we find that the third-party defendants' sureties, Gulf American and American States, are not liable on Stone's fraud claim, their contractual liability arising out of the surety bond issued for this estate is a matter that remains to be determined by the trial court on remand.
The judgment of the trial court, insofar as it denied Stone's first claim for relief, is reversed, and this cause remanded for a full hearing and settlement, in a manner consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
HORNSBY, C.J., and JONES, ADAMS and STEAGALL, JJ., concur.
ALMON and SHORES, JJ., dissent.
HOUSTON and KENNEDY, JJ., recused.
SHORES, Justice (dissenting).
While I share my brothers' sympathy for the appellant, I cannot overlook the fact that every rule of law extant at every critical time in her life is against her position. Illegitimates could not inherit from their fathers at the time her father died (1953). They could not inherit at the time his estate was litigated in 1967 and 1968 when the Circuit Court of Montgomery County entered its final judgments to that effect. No appeal was taken from those final judgments.
The majority suggests that this Court might have changed the law had the guardian ad litem appealed the 1968 judgment. That assumption is speculation at best, but to give the appellant the benefit of that guess all of these years later is unprecedented.
The majority permits the appellant to challenge final judgments after approximately 17 years and more than 11 years after she reached majority in 1974, and would permit her to reopen the estate of her father, dead now for more than 36 years. All of this is permitted more than a decade and a half after a guardian ad litem appointed to represent her interests apparently concluded that he had discharged the duties of his office.
When are judgments final? The majority does not say. It attempts to temper its assault on the finality of these judgments by permitting the appellant to share in only a part of the decedent's estate: royalties paid since August 5, 1985, forward. Apparently, then, even the majority is unprepared to give the appellant full status as an heir to Hank Williams's estate. Apparently, she takes no interest in any real estate he may have had. She is allowed to participate in royalties payable only after August 5, 1985. Presumably, had Hank Williams's estate consisted of liquidated assets only, she could not have prevailed. I have never before heard of one's legal status as an heir turning on the nature of the assets of the estate. Not surprisingly, the majority cites no authority for its holding.
Because I feel bound to apply the law to these facts, sad though they are, I am compelled to dissent.
ALMON, J., concurs.

ON APPLICATION FOR REHEARING
MADDOX, Justice.
Both Irene Smith and Jones, Murray and Stewart, P.C., have asked this Court to clarify its original opinion and to state that the summary judgments granted to them insofar as they denied Stone's request for damages against them are affirmed. Stone has again requested (1) that this Court reverse the trial court's summary judgment on her fraud claims against third-party defendants Smith and Jones, Murray and Stewart, and (2) that this Court modify its opinion to allow her to share in the estate of Hank Williams, Sr., from the date of his death in 1953, rather than from the *371 date on which she made a demand on Hank Williams, Jr., in 1985.
In a brief styled "Petition of Randall Hank Williams for Leave to Appear for Purpose of Seeking to Vacate and Modify Opinion of July 5, 1989 and for Stay of Issuance of Certificate of Judgment Pending Further Proceedings," Williams, Jr., asks this Court to vacate and modify its original opinion on the ground that he was not a party to the appeal, and, therefore, that his due process rights were violated. Williams, Jr., argues that because Stone appealed only from the summary judgment granted on her third-party claim, she is barred by the doctrine of res judicata, because she did not appeal the summary judgment granted to him on his claim that she was not an "heir." In short, Williams, Jr., claims that even though Stone has shown that she is the natural child of Hank Williams, Sr., and even if that determination in her favor was not appealed by him, she is now barred from inheriting because she did not appeal the adverse determination by the trial court that she was not an "heir," even though she has been judicially determined to be a natural child.
As set forth in the our original opinion, Williams, Jr., initiated this action by filing a declaratory judgment action seeking a declaration that Stone had no entitlement to Hank Williams's estate. Stone filed a counterclaim against Williams, Jr., and alleged that she was the natural daughter of Williams, Sr. Williams, Jr., joined issue on that claim.
Stone later filed a third-party complaint against Smith; Jones, Murray and Stewart, P.C.; and several fictitiously named parties, asking that the estate be reopened; she also asked for compensatory and punitive damages against third-party defendants Smith and Jones, Murray and Stewart, P.C. Gulf American Fire & Casualty Company and American States Insurance Company were also named as third-party defendants. The trial court entered a "Partial Summary Judgment" for Williams, Jr., on his complaint and entered a "Partial Summary Judgment" against Stone on her counterclaim and on her third-party complaint, finding "that there remains a justiciable issue raised in the Complaint filed by the Plaintiffs where the Court is specifically asked to declare that Williams, Jr. is the sole child of Williams, Sr.... [and that] [t]his issue as framed by the Complaint is still factually disputed and on that issue Summary Judgment is not appropriate even though it is conceded by the Court that such a determination would not affect the outcome of the other issues raised by the pleadings."
As the trial court stated in its order on October 26, 1987, Williams, Jr., throughout the proceedings, subsequent to the time when the court entered its "Partial Summary Judgment" on July 14, 1987, objected to the trial court's proceeding forward to determine Stone's paternity, and excepted to the Court's interpretation of the pleadings.[1] *372 Stone admittedly did not appeal the entry of the "Partial Summary Judgment"[2] entered in favor of Williams, Jr., on his complaint, and on Stone's counterclaim on July 14, 1987, likewise, Williams, Jr., did not appeal the adverse ruling that Stone was the natural child of Hank Williams, Sr., that was entered on October 26, 1987. Naturally, Stone did not appeal from the October 26, 1987, determination that she was the natural child of Williams, Sr., because it was favorable to her.
It is clear that the doctrine of res judicata does not apply in this situation, because that doctrine prohibits the relitigation of all matters that were or could have been litigated in a prior action. Century 21 Preferred Properties, Inc. v. Alabama Real Estate Comm'n, 401 So.2d 764, 768 *373 (Ala.1981). Here, the complaint of Williams, Jr., and Stone's counterclaim and third-party complaint were litigated together.
As the trial court found, the main thrust of Stone's third-party claim involved "an argued duty to disclose and the willful or fraudulent failure to do so." This Court, in its original opinion, found that there was a duty, that there was a breach of that duty, and that Stone was entitled to have the estate reopened, but was not entitled to any damages against the third-party defendants. Williams, Jr., in his petition before us, claims that Stone's third-party complaint was only for indemnification and that "Stone's request in her third-party complaint to reopen the estate was simply meaningless surplusage." We cannot agree. On original deliverance, we considered whether summary judgment was appropriate on this third-party complaint, which contained claims that were both in personam and in rem. Although we did not elaborate on the issue, we necessarily determined that Stone's request to have the estate reopened was an action in rem.[3] Additionally, this Court, on another appeal in this case, treated the original declaratory judgment action filed by Williams, Jr., as one filed pursuant to the provisions of Ala. Code 1975, § 6-6-225. In Ex parte Stone, 502 So.2d 683 (Ala.1986), this Court stated the following concerning the nature of the underlying declaratory judgment action:
"Further support for the trial court's refusal to dismiss the Williams Group's complaint can be found in Code of Alabama, 1975, § 6-6-220, et seq., the Declaratory Judgment Act. Specifically, § 6-6-225 provides:
"`Any person interested as or through an executor, administrator, trustee, guardian or other fiduciary, creditor, devisee, legatee, heir, next of kin or cestui que trust in the administration of a trust or of the estate of a decedent, infant, incompetent or insolvent may have a declaration of rights or legal relations in respect thereto:
"`(1) To ascertain any class of creditors, devisees, legatees, heirs, next of kin or other;
"`(2) To direct the executors, administrators or trustees to do or abstain from doing any particular act in their fiduciary capacity; or
"`(3) To determine any question arising in the administration of the estate or trust, including questions of construction of wills and other writings.'
"The instant dispute plainly falls within the scope of this statute, and the declaratory judgment action filed by the Williams Group is thus a viable means of settling this dispute."
502 So.2d at 686.
Stone's claim in her third-party complaint, in which she seeks to reopen the estate, is not essentially different from the prayer of Williams, Jr., for relief in his declaratory judgment action, wherein he specifically asked:
"That in the event this Court alters, modifies or otherwise changes the prior Orders and Judgments in Civil Action Nos. 25,056 and 27,960 that this Court proceed to adjudicate and determine the rights of the parties hereto with regard to the Estate of Hiriam Hank Williams and the copyright and renewal copyright interests of the musical compositions of Hiriam `Hank' Williams."
To apply the principles of res judicata or of collateral estoppel in this case would be most inequitable, and would violate the spirit of both Rule 1, A.R.Civ.P. and Rule 1, A.R.App.P., and would elevate form over substance. It is clear that both the complaint of Williams, Jr., and Stone's third-party complaint asked for a determination of Stone's right to share in the estate.
*374 As we indicated in our original opinion, the claims of the various parties in this case are so intertwined and the factual situation is so unique that notions of fairness require that the entire controversy be settled in one proceeding.[4] See City of Tuscaloosa v. Fair, 232 Ala. 129, 167 So. 276 (1936), overruled in part on other grounds by Jacks v. City of Birmingham, 268 Ala. 138, 105 So.2d 121 (1958). Stone did indeed appeal a judgment that held that she was not entitled to have the estate reopened. She convinced this Court that the record in this case showed that she was, in fact, entitled to have the estate reopened. To say that she was barred from raising her claims on that appeal because she did not also appeal a simultaneous judgment with the same holding would be unfair under City of Tuscaloosa v. Fair and the spirit of the Alabama Rules of Civil Procedure.[5]
Even though we hold that the third-party action seeking to reopen the estate was in rem and that Williams, Jr., essentially asked for the same relief in the original declaratory judgment action that Stone requested in her third-party complaint, we, nevertheless, have carefully considered the argument of Williams, Jr., that, because Stone did not appeal the summary judgment entered in favor of him on his declaratory judgment complaint, this Court should not have determined, on this appeal, whether Stone was entitled to have the estate reopened and to share in the estate because he was not a party to the appeal.
This Court, on original submission, carefully considered whether it should allow this estate to be reopened. The dissenting Justices were of the opinion that we should not permit it to be reopened. On original deliverance, we noted "throughout [the] opinion the unique character of this case," and that "[i]n fashioning an appropriate remedy, we [took] these peculiar circumstances into consideration."
Although the judgments appealed from were summary judgments, there was voluminous evidence presented, much of which we took into consideration in fashioning our order on original deliverance. The basic facts upon which our legal determination was made were not disputed; therefore, we were presented with questions of law, considering those admitted facts. As the original opinion shows, this Court carefully considered the rights of individuals, including petitioner Williams, Jr., who had relied upon the prior decrees that this Court held were due to be set aside, and our judgment was not unanimous; there were dissenting views.
On application for rehearing, we have carefully considered Stone's argument that we should allow the estate to be reopened from the beginning, and we have considered very closely the argument of Williams, Jr., that we should not let Stone share at all, even though she has been judicially declared to be the natural daughter of Williams, Sr. We believe we reached a just and equitable result on original deliverance, and we are of the opinion that the petition of Williams, Jr., for leave to appear for the purpose of seeking to vacate and modify this Court's July 5, 1989, opinion is due to be denied. In reaching this conclusion, we apply the statutory principle in Code, 1975 § 12-22-70, which is merely declaratory of an appellate court's power, that "[t]he appellate court may, upon the reversal of any judgment or decree, remand *375 the same for further proceedings or enter such judgment or decree as the court below should have entered or rendered, when the record enables it to do so." The record in this case allows us to do that, because the facts of the case have been fully developed in this record, and the evidence is either undisputed or without material conflict. In such a case, the general rule particularly applicable is stated in 5B C.J.S. Appeal and Error § 1925 (1958), pages 425-27:
"The general rule that the appellate court may, on reversal, render or direct final judgment is particularly applicable where the facts of the case have been fully developed on the trial, and there is nothing on which the party against whom reversal was made could strengthen his case or ground further proceedings, and it appears from the record that the evidence on another trial would be substantially unchanged."
Because we are of the opinion that Stone is not precluded by res judicata or collateral estoppel from having the estate reopened and because we believe that, based on the facts of this case, which were fully developed in this record and on the further fact that the position advanced by Williams, Jr., that Stone was not an "heir" was adequately presented by other parties on this appeal, and based on this Court's independent consideration of his position in view of the in rem nature of the proceeding, we cannot see how Williams, Jr., could strengthen his position on the law of this case. In fact, since original deliverance, we have located another case which appears to support the result we reached. The Supreme Court of Mississippi recently stated in Collier v. Shell Oil Co., 534 So.2d 1015, 1017 (Miss. 1988): "One who has acquired title by operation of law under prior interpretation of the law regulating descent and distribution must yield to a subsequent change of interpretation." See also Reed v. Campbell, 476 U.S. 852, 106 S.Ct. 2234, 90 L.Ed.2d 858 (1986) (Trimble v. Gordon, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1978), can be applied retroactively).
Based on the foregoing, we deny the petition of Randall Hank Williams, Jr., and we overrule the application for rehearing filed by Stone, and we affirm the entries of summary judgment for Smith and Jones, Murray, and Stewart, P.C., on Stone's claim for fraud.
PETITION OF RANDALL HANK WILLIAMS, JR., DENIED; APPLICATION FOR REHEARING BY STONE OVERRULED; OPINION EXTENDED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
JONES, ADAMS and STEAGALL, JJ., concur.
ALMON and SHORES, JJ., dissent.
HORNSBY, C.J., and HOUSTON and KENNEDY, JJ., recused.
SHORES, Justice (dissenting).
The majority excuses its disregard of the law by calling this a unique case, but it cannot escape the fact that Williams, Jr., won the controversy between him and Stone in the court below and that Stone did not appeal that judgment. That judgment became final, and it decided the issue of whether Stone could share in the estate of Hank Williams, Sr. As the Restatement (Second) of Judgments § 33 (1982) states:
"A valid and final judgment in an action brought to declare rights or other legal relations of the parties is conclusive in a subsequent action between them as to the matters declared, and, in accordance with the rules of issue preclusion, as to any issues actually litigated by them and determined in the action."
Stone appealed a judgment entered in her impleader action against certain other third parties. Williams, Jr., was not before this Court. Yet this Court has decided that Williams, Jr., now loses the case between him and Stone and by doing so refuses to follow all of the applicable substantive law pertinent to the issues and now disregards the procedural rules as well. If this case were not so unique, the issues between Williams, Jr., and Stone that were decided by a court of general jurisdiction in favor of Williams, Jr., would be settled forever because they are res judicata. As Professor Moore has written:

*376 "If an appeal is taken from only part of the judgment, the remaining part is res judicata, and the vacation of the portion appealed from and remand of the case for further proceedings does not revive the trial court jurisdiction of the unappealed portion of the judgment."
1B J. Moore, Moore's Federal Practice ¶ 0.404 (2d ed. 1988).
I think the Court's action violates the constitution of this state and the Constitution of the United States in that it directly affects property rights of Williams, Jr., that were vested, if not at the time the estate of Williams, Sr., was finally closed, then surely by the entry of final judgment in his favor in his declaratory judgment action, which this Court held was the proper way to finally determine whether Stone had an interest in the estate. As Professor Moore has said in commenting upon the failure of a court to give res judicata effect to binding prior orders:
"The due process clause of the Fourteenth Amendment should preclude a state from subsequently restricting or refusing effect to one of its judgments as res judicata beyond a certain point. The reasons for this conclusion are: judicial rights were vested by the judgment; they may be divested by the usual judicial remedies of direct attack, and remedies to enjoin or otherwise obtain relief from the judgment; just as a party may not arbitrarily be deprived of his rights under a valid judgment. And a state constitutional due process provision would similarly act as a check upon state power to deprive a party unjustly of vested rights in a judgment rendered by the state court."
1B J. Moore, Moore's Federal Practice ¶ 0.406 (2d ed 1988).
It has often been said that hard cases make bad law. This case demonstrates that unique facts can result in a disregard for all law.
ALMON, J., concurs.
NOTES
[1] Irene Smith and Robert Stewart were the administratrix and administrator of the Williams estate, and Gulf American wrote the bond. The estate of Robert B. Stewart was dismissed as a third-party defendant by Stone on March 25, 1987.
[2] In their complaint for declaratory judgment, they asked for the following relief:

"2. That this Court enforce and uphold in every respect the prior Orders and Judgments of this Court in Civil Action Nos. 25,056 and 27,960, declare them valid and binding upon the parties hereto, and enjoin Catherine Yvonne Stone from making further claims and demands relative to the estate of Hiriam "Hank" Williams or the aforesaid copyright interests or renewals thereof.
"3. That in the event this Court alters, modifies or otherwise changes the prior Orders and Judgments in Action Nos. 25,056 and 27,960 that this Court proceed to adjudicate and determine the rights of the parties hereto with regard to the Estate of Hiriam Hank Williams and the copyright and renewal copyright interests of the musical compositions of Hiriam `Hank' Williams.
"4. That this Court will grant to the Plaintiffs such other, further and different appropriate relief to which they may be entitled."
[3] In her first claim for relief in her third-party complaint Stone named Smith, Stewart, and several fictitiously named real parties in interest and alleged, inter alia, that "[f]rom in or about 1953 through sometime in 1967, Smith, Stewart and [Jones, Murray and Stewart], through Stewart, and real parties in interest C, D, E, F, G, H, I, J, K, M, and N, intentionally, willfully and fraudulently concealed Stone's identity, existence, claim, and rights as [a] natural child of Hank Williams, Sr. from the Montgomery County Circuit Court in contravention of their respective fiduciary obligations to Stone and in contravention of their respective obligations to the court."
[4] Stone's first claim for relief requested the following:

"1. That the estate of Williams, Sr. be reopened and all orders purportedly governing Stone's rights in that estate be declared null and void.
"2. That Stone be entitled to share her proportionate interest in all property and income of the estate."
[5] Stone did not appeal the adverse ruling on her counterclaim either. We will discuss that issue in this opinion under the section "Relief Granted," infra.
[6] Audrey Williams and Hank Williams divorced in 1952.
[7] For a more detailed discussion of why the guardian ad litem did not appeal, see the section "Error of Law," infra.
[8] It is interesting to note that Smith, who was the administratrix for the estate during 1967 and 1968, also acted as the guardian for Williams, Jr., during these proceedings. Further, she had also acted as the guardian for Williams, Jr., while administratrix, in 1963, in the proceeding to allow Williams, Jr., to contract with Fred Rose Music, Inc., concerning his interest in his father's copyright renewals. It is also interesting that this procedure is in substance the one suggested by Stewart in his July 5, 1962, letter, as alternative "c", that is, a legal way to cut off Stone's right to copyright renewals she was entitled to under federal law, even though illegitimate.
[9] In fact, on May 28, 1968, just 4 months after Judge Emmet denied the guardian ad litem permission to appeal, the Supreme Court of the United States, in Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968), commented on the harsh common law concept that illegitimate children were nullius fillius, as follows:

"We start from the premise that illegitimate children are not `nonpersons.' They are humans, live, and have their being. They are clearly `persons' within the meaning of the Equal Protection Clause of the Fourteenth Amendment.
"* * * *
"Why should the illegitimate child be denied rights merely because of his birth out of wedlock? He certainly is subject to all the responsibilities of a citizen, including the payment of taxes and conscription under the Selective Service Act. How under our constitutional regime can he be denied correlative rights which other citizens enjoy?"
391 U.S. at 70-71, 88 S.Ct. at 1510-1511.
[10] In its December 1, 1967, order, the court stated:

"In the opinion of the Court, there has not been sufficient compliance with the requirements of Section 11 of Title 27 of the Code of Alabama to give the child in question any right of inheritance from Hiriam Hank Williams or to receive any part of his estate. The Court is further of the opinion that under all the evidence heard and considered by the Court, Randall Williams is the sole heir and only distributee of the Estate of Hiriam Hank Williams...."
Furthermore, in its January 30, 1968, decree, the court stated that while it was "impressed with the argument of the Guardian Ad Litem [for Stone]," and "adopt[ed] the sound reasoning... that the time is long past due when illegitimate offspring should be afforded adequate property rights," the court, nevertheless, found that Stone had been adopted and that her adoptive parents, after having been notified of the proceedings, "chose not to pursue any action in regard to these proceedings," and that she could not recover.
The trial court's conclusion that adoption precluded an "after-adopted" illegitimate child from inheriting was erroneous, however. This subject is discussed, infra, under the heading "Intestate Succession and the Illegitimate Child."
[11] See our discussion, infra, under "Error of Law," concerning the right of a guardian ad litem to appeal an adverse ruling on behalf of a child, and the duties of a guardian ad litem and the duty of the court when a minor's interest is involved.
[12] His withholding of one-half of the monies, even after the favorable 1967 and 1968 decrees, and his 1962 correspondence shows his concern about the child's ever discovering who she was.
[13] We note that, usually, paternity or legitimation proceedings are initiated by a parent of the child; however, in this case Stone's natural parents were deceased or unavailable and her adoptive parents were hostile in regard to this matter. Furthermore, once Stone was made a ward of the state, the Alabama Department of Pensions and Security could have pursued the child's rights; however, it did not. Finally, while Stone was a ward of the court, Judge Emmet, although convinced that the law regarding illegitimates was not right (and the Supreme Court of the United States so held in Levy v. Louisiana shortly thereafter), he, too, failed in his duty to protect the child's right by refusing to grant her guardian ad litem permission to appeal (see discussion, infra, "Error of Law").
[14] We have previously noted that this procedure was substantially what Stewart had suggested to Wesley Rose's attorney in 1962 as an alternative way to forever bar Stone from sharing in the copyright renewals.
[15] We are aware that there are many settlements involving minors made in pending lawsuits, in which courts are called upon to make certain that such settlements are in the best interest of the minor. We further note that Alabama law has been especially sensitive with regard to the rule that any settlements made on behalf of minors be approved by the court. In Large v. Hayes, 534 So.2d 1101 (Ala.1988), this Court recognized the role of the trial court in determining what is in the "best interest of the minor," as follows:

"This Court has recognized the special nature of an attempted settlement of a minor's claim. Before such a settlement can be approved, there must be a hearing, with an extensive examination of the facts, to determine whether the settlement is in the best interest of the minor....
"`"The Court may, upon being advised of the facts, upon hearing the evidence, enter up a valid and binding judgment for the amount so attempted to be agreed upon, but this is not because of the agreement at allthat should exert no influencebut because it appears from the evidence that the amount is just and fair, and a judgment therefor will be conservative of the minor's interests."'" Large, 534 So.2d at 1105 (citations omitted).
[16] The issues of statutes of limitations and laches, as they relate to this case, are treated in our discussion under the heading "Timeliness," infra.
[17] The reader should bear in mind that no issue has been raised as to the timeliness of Stone's paternity action below. Therefore, our discussion concerns only her action to have the prior judgments set aside on the basis of fraud.
[18] We also note that Williams, Jr., Acuff, and Rose are the parties who initiated the litigation from which this appeal arose, and who, themselves, sought a resolution of the matter of Stone's rights in the estate of Hank Williams.

In their complaint for declaratory judgment, Williams, Jr., Acuff, and Rose requested the following relief:
"2. That this Court enforce and uphold in every respect the prior Orders and Judgments of this Court in Civil Action Nos. 25,056 and 27,960, declare them valid and binding upon the parties hereto, and enjoin Catherine Yvonne Stone from making further claims and demands relative to the estate of Hiriam `Hank' Williams or the aforesaid copyright interest or renewals thereof.
"3. That in the the event his Court alters, modifies or otherwise changes the prior Orders and Judgments in Actions No. 25,056 and 27,960 that this court proceed to adjudicate and determine the rights of the parties hereto with regard to the Estate of Hiriam `Hank' Williams and the copyright and renewal copyright interest of the musical compositions of Hiriam `Hank' Williams.
"4. That this Court will grant to the Plaintiffs such other, further and different appropriate relief to which they may be entitled."
[19] It is quite possible that the 1952 custody and support agreement would have been sufficient to legitimate Stone if Stewart, the child's mother, or other parties, including the State of Alabama, had attempted to utilize this method. Code 1940, Tit. 27, § 11, in effect at the time of Stone's birth, provided specifically as follows:

"The father of a bastard child may legitimate it, and render it capable of inheriting his estate, by making a declaration in writing, attested by two witnesses, setting forth the name of the child proposed to be legitimated, its sex, supposed age, and the name of the mother, and that he thereby recognizes it as his child, and capable of inheriting his estate, real and personal, as if born in wedlock; the declaration being acknowledged by the maker before the judge of probate of the county of his residence, or its execution proved by the attesting witnesses, filed in the office of the judge or probate, and recorded in the minutes of his court, has the effect to legitimate such child."
Normally, any agreement would have been filed before the father's death, but the statute was not so limited.
[20] We recognize that there is no Alabama case law on the issue of whether a purely contractual obligation to pay child support survives the death of the obligor; however, some jurisdictions, even at the time of Stone's birth, had held that death did not terminate a voluntary contractual obligation made by the decedent to pay child support, such as that made in the present case. We need not decide in this case whether a court-ordered obligation to pay child support survives the death of the obligor; however, we do hold that an agreement to pay child support, such as that involved in this case, that is purely contractual and voluntarily entered without judicial compulsion, does not lose its enforceability at the death of the obligor, unless otherwise expressed.

We note, in particular, the following cases:
1) In re Cirillo's Estate, 114 N.Y.S.2d 799 (Queens Sur.1952), in which the court, settling an account against the estate of the deceased, held that while generally a child support obligation ends with the death of the parent, the deceased's agreement to make support payments as long as his responsibility for the support of the illegitimate child existed under the law indicated that he intended to bind his estate beyond his death; and
2) Stumpf's Appeal, 116 Pa. 33, 8 A. 866 (1887), in which the court reversed a judgment disallowing the plaintiff's claim against the putative father's estate and held that there was nothing in the support agreement to indicate an intention by the obligor to limit his obligation to support his illegitimate child to his lifetime only and that the evidence showed that the purpose of the agreement was to save the mother from the expenses of rearing the child, and thus, the contract was continuing and binding on the decedent's estate.
See also, Annot., Validity and Construction of Putative Father's Promise to Support or Provide for Illegitimate Child, 20 A.L.R.3d 500, 540 (1968).
[21] Of course, the rights of illegitimates to equal protection had been decided in Levy v. Louisiana in 1968.
[22] While not at issue in the present case, it is worth noting that the comments to this section expressly state that there is no time limitation in which to bring an action for paternity under this section because the drafters had serious reservations about the constitutionality of the former two-year limitations period adopted in Everage, and rightfully so. See Abrams v. Wheeler, 468 So.2d 126 (Ala.1985) (which recognized that the two-year limitations period in Everage was unconstitutional).
[23] For the purpose of clarity, we briefly recap the evidence that compelled the trial court's finding of paternity that is now undisputed in this case: 1) the 1952 custody and support agreement, that was drafted by Williams's attorney, refers to Hank Williams throughout as the "father" of the child; 2) the 1952 agreement, itself, requires a relinquishment by the mother of virtually all rights in the child to Hank Williams; 3) the 1952 agreement provided that the mother be given a one-way plane ticket to California, and that the child live with Lillian Stone, Williams's mother, for two years, during which time he would fully support the child; 4) the 1952 agreement provided that at the age of 3, the child "was to live with him [Hank Williams] continuously and be wholly and completely supported for by him, and cared for by him" (it is interesting to note that at the time this agreement was drafted, Williams, Jr., did not live with his father, but rather, lived in Tennessee with his mother, Audrey Williams; it appears, then, that Hank Williams attempted to provide the opportunity for a closer parent-child relationship with Stone, who was to live with him, than that being enjoyed by his other child); 5) Lillian Stone, Irene Smith, and other family members acknowledged and publicly held the child out as the daughter of Hank Williams; and 6) the records of the Montgomery County Department of Public Welfare repeatedly document that Stone's natural father was Hank Williams. Therefore, unlike many cases in which the alleged father denies paternity and wishes to have nothing to do with the child, this is a case in which the father not only wished to accept responsibility for the child, but convinced the mother to give the child up, so that it might live with him and be reared by him.
[24] While the paternity action is not an issue in the present case, it is interesting to note that Stone brought this action to set aside the former judgments and to declare her rights in her natural father's estate within 11 years after reaching the age of majority, which compares favorably with the delay in Cotton, 495 So.2d 1077 (Ala. 1986), and Free, 507 So.2d 930 (Ala.Civ.App. 1986).
[25] In fact, in 1954, at the time of Stone's adoption, Alabama's law provided specifically that "[n]othing in this chapter dealing with adoption shall be construed as debarring a legally adopted child from inheriting property from its natural parent or other kin." Code 1940, Tit. 27, § 5. (Emphasis added.)
[26] It should be apparent that the time lapse approved in this case may not be approved in other factual settings.
[1] For a better understanding of the legal effect of the trial court's grant of "Partial Summary Judgment" and the continuance of the case for a determination of Stone's paternity, over the objection of Williams, Jr., we set out portions of the trial court's orders:

"The instant suit was commenced by the Plaintiffs on September 10, 1985 by Complaint for Declaratory Judgment and Injunctive Relief. The Complaint was amended twice with the last amendment being filed on November 14, 1985. Stone filed her Counterclaim for Establishment of Paternity, Declaration of Rights and Imposition of Constructive or Resulting Trust on October 14, 1986. Her third party complaint was also filed on that date.
"The issues raised by the motions for summary judgment presently before this Court are as follows:
"Whether, because of her illegitimate status and her status as an adopted child, Stone is barred by applicable state law from now attempting to establish that she is an heir of the Williams, Sr. estate.
"Whether Stone has ever been adjudicated to be a child of Hank Williams, Sr.
"Whether, based upon the facts not now in dispute, the third party complaint states a cause of action upon which relief may be granted.
"* * * *
"Turning to the issue of the alleged status of Stone as the child (as opposed to legal heir) of Williams, Sr., it is clear from the record that there was never a judicial determination relative to the biological relationship between Stone and Williams, Sr. As the Court noted in 1967, it was not necessary for the Court to make such a determination in reaching its decision at that time as it was irrelevant. Thus, res judicata and collateral estoppel do not affect that question and it remains an issue of disputed fact between the parties.
"As to the third party claim filed by Stone, the Court is of the opinion that the main if not the entire thrust of the complaint revolves around an argued duty to disclose and the willful or fraudulent failure to do so. In 1953 Stone was not an heir to the estate of Williams, Sr., and she could not have been established as such under then existing law. If the existence of Stone had been made known to the Court by any of the third party defendants, it is assumed that the Court in adjudicating her claim would have applied the law as it then existed and would therefore have ruled that her claim was at that time invalid. The only obligation or duty that could be foreseeable in a situation such as exists in this case would be a requirement that the Third Party Defendants act in good faith according to the law of the State of Alabama as it existed at that time. The Court deems it unreasonable to impose upon them the duty to anticipate or foresee what the law should or might become in the future. At the time that the alleged fraudulent concealment purportedly occurred, a full disclosure to the Court or to interested third parties would have been superfluous. Therefore, the Court is of the opinion that the Third Party Complaint does not state a cause of action for which recovery can be had.
"It appears from the record and from a complete review of the proceedings in this case that the law requires that the Court enter a Partial Summary Judgment in this cause. The Court finds that there remains a justiciable issue raised in the Complaint filed by the Plaintiffs where the Court is specifically asked to declare that Williams, Jr. is the sole child of Williams, Sr. This issue as framed by the Complaint is still factually disputed and on that issue Summary Judgment is not appropriate even though it is conceded by the Court that such a determination would not affect the outcome of the other issues raised by the pleadings.
"Based on the foregoing it is therefore ORDERED, ADJUDGED, AND DECREED BY THE COURT AS FOLLOWS:
"The Motion for Summary Judgment filed herein by the Plaintiffs as it refers to the original Complaint is GRANTED as to all issues with the exception of whether or not the Defendant is the biological child of Williams, Sr.
"The Motion for Summary Judgment filed herein by the Plaintiffs as it refers to the Counterclaim is granted as to all issues.
"The Motions for Summary Judgment filed by the Plaintiffs and the Third Party Defendants as they relate to the Third Party Complaint are GRANTED on all issues.
"Further proceedings in this cause are hereby set on the 25th day of August, 1987 at 10:00 a.m.
"DONE THIS THE 14TH DAY OF JULY, 1987.
"s/H. MARK KENNEDY
"CIRCUIT JUDGE"
On October 26, 1987, the trial judge entered a final judgment in the case, which held inter alia:
"Plaintiffs throughout these proceedings, subsequent to this Court's Order on Motions for Summary Judgment, have objected to this Court's proceeding forward and have excepted to the Court's interpretation of the state of the pleadings. Regardless of whether the question is framed as, is the Defendant the natural daughter of Williams, Sr., or is Williams, Jr. the only natural child, the court reiterates that the issue that remains before the court is the biological status of Defendant Stone. The court is of the opinion that that issue was raised by the Plaintiffs in the original Complaint, was joined by the Defendant, and now is a legitimate, justiciable issue.
"In lieu of making additional findings of fact, the Court adopts the findings as stated in the previous Orders of this Court. Based upon those findings and the additional evidence as submitted at the hearing of September 2, 1987, the court is of the opinion that it continues to have jurisdiction over the parties and of the subject matter and does hereby enter the Final Order.
"The Court upon consideration of the evidence does hereby find that Hank Williams, Jr. is not in fact the only natural child of Hank Williams, Sr. in that Defendant Catherine Yvonne Stone is also a natural child of Hank Williams, Sr."
[2] In his petition before us, Williams, Jr., notes that the "Partial Summary Judgment" was "interlocutory and not subject to immediate appeal." See Rule 54(b), Ala.R.Civ.P.
[3] In 1A C.J.S. Actions § 4 (1985), pp. 309-10, it is said:

"As its name implies, an action in rem is an action or proceeding against a `thing' or property, instead of a person; a proceeding to determine the state or condition of the thing itself; a judicial proceeding against the thing itself, which terminating in a valid judgment binds all the world. It has been said, however, that an action or proceeding in rem is difficult to define with accurate completeness, its exact nature being best understood by reference to its essential features."
[4] It is perfectly clear that the judgment of the trial court on the declaratory judgment action and on the third-party complaint was premised upon an erroneous determination by the trial court that even if Stone was a natural child of Williams, Sr., she was not an "heir."
[5] The July 14, 1987, judgment of the trial court adjudicated all claims of the parties except Stone's claim that she was a natural child of Williams, Sr. Williams, Jr., strongly resisted the trial court's jurisdiction to make the subsequent finding. Also, it should be remembered that the trial court granted the third parties' motion for a summary judgment, and although the judgment was not specifically made final and appealable pursuant to the provisions of Rule 54(b), Ala.R.Civ.P. (it was denominated a "Partial Summary Judgment" by the trial court), it would not be in keeping with the spirit of the Alabama Rules of Civil Procedure to hold that Stone would now be precluded from sharing in the estate, especially when Williams, Jr., specifically asked that Stone's claim be adjudicated pursuant to Ala.Code 1975, § 6-6-225.